1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

JONATHAN FELIX,

Plaintiff,

v.

CITY OF SAN DIEGO, et al.,

Defendants.

Case No.:  3:19-CV-0891 W (MSB)

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' SUMMARY-JUDGMENT MOTION [DOC. 49]**

Pending before the Court is Defendants' motion for summary judgment and partial summary judgment.  The Court decides the matter on the papers submitted and without oral argument.  See Civ. L.R. 7.1(d.1).  For the reasons that follow, the Court **GRANTS IN PART** and **DENIES IN PART** the motion [Doc. 49].

//

//

//

1

I.   **FACTUAL BACKGROUND**

In the context of a summary-judgment motion, "courts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the motion.'" Scott v. Harris, 550 U.S. 372, 378 (2007) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)).  "In qualified immunity cases, this usually means adopting… the plaintiff's version of facts."  Id.

\*        \*        \*

Plaintiff Jonathan Felix works as an executive sous-chef at two high-end restaurants in San Diego.  On November 7, 2018, after working at both restaurants that day, Felix left work at 12:30 a.m. and drove to McGregor's Bar & Grill, located a short walk from his apartment.  (*Pl's Ex. A* [Doc. 50-1] 118:9–119:114, 132:2–23; *Felix Decl.* [Doc. 50-19] ¶ 2.)  Parking was difficult at Felix's apartment complex at night and McGregor's would give customers a parking pass to display on their windshield, allowing them to leave their vehicle in the parking lot overnight.  (*Felix Decl.* ¶ 3.)  Felix, therefore, planned to leave his vehicle in McGregor's parking lot and pick it up in the morning when there would be more parking at his apartment complex.  (*Id.*)

When Felix entered McGregor's, Defendants Ross Bainbridge, Anthony Duncan, Frank Bigler and Nicholas Dabbaghian were sitting at a table.  (*Defs' Ex. 15* [Doc. 49-5] 12:5–10.)  Defendants are police officers with the San Diego Police Department and had all just finished their work-week shifts.  (*Id.* 12:11–15; *Defs' Ex. 18* [Doc. 49-8] 16:3–10.)  Officer Joe Rodriguez was also with the group, though he had to work the next day.  (*Id.* 12:5–10.)  The group arrived at the bar around midnight.  (*Id.* 12:16–18; *Defs' Ex. 16* [Doc. 49-6] 10:21–11:1; *Defs' Ex. 17* [Doc. 49-7] 23:17–20.)  While at the bar, the Officers all consumed alcohol.  (*Pl's Ex. B* [Doc. 50-2] at 25:6–8; *Pl's Ex. C* [Doc. 50-3] at 12:13–17; *Pl's Ex. D* [Doc. 50-4] 27:23–15; *Pl's Ex. E* [Doc. 50-5] at 20:24–21:7; *Pl's Ex. F* [Doc. 50-6] at 25:3–5.)  Felix also consumed alcohol at McGregor's and had used cocaine approximately four hours earlier.  (*Felix Decl.* ¶ 5; *Defs' Ex. 22* [Doc. 49-12] 162:18–22; *Pl's Ex. A* at 135:12–15.)

2

After last call, Felix left the bar first and walked over to his Dodge Durango, which was parked approximately four parking spaces to the south-west of Officer Bainbridge's car. (*Defs' Ex. 1* [Doc. 49-3] 2:12:10–2:12:55[1].)  He then smoked a cigarette, opened and closed the driver's side door, waved goodbye to someone and eventually walked out of the parking lot toward his apartment. (*Defs' Ex. 1* at 2:12:55–2:14:50.)

Shortly after Felix exited the bar, the officers also exited and stood near the bar's entrance. (*Defs' Ex. 1* 2:13:20–2:14:15.)  Officer Rodriguez believed Felix was staring at the officers while they were in the bar and mentioned it to Dabbaghian. (*Defs' Ex. 16* at 17:25–18:5.)  As Felix began walking out of the parking lot, Dabbaghian walked over near the back of Felix's SUV, looked around and then returned to the other officers standing near the bar's entrance. (*Id.*; *Defs' Ex. 1* at 2:14:15–2:15:27.)  The officers then walked over to Bainbridge's car—a few spots away from Felix's SUV—to continue hanging out. (*Id.* 2:14:50–2:16:15.)  When they got to his car, Bainbridge opened the trunk to use as a seat. (*Defs' Ex. 15* at 27:2–10; *Defs' Ex. 16* at 18:10–18; *Defs' Ex. 17* at 16:2–10.)

Meanwhile, as the officers were walking toward Bainbridge's car, Felix returned to the parking lot and walked back to his vehicle. (*Defs' Ex.* 1, 2:16:00–2:16:35.)  Felix testified that he returned to retrieve his backpack, though video clearly shows him wearing his backpack as he walked back to his SUV. (*Id.* 2:16:12; *Defs' Ex. 22* at 206:2–19.)  When Felix saw the men hanging out at Bainbridge's car, he became concerned they were going to break into his SUV. (*Defs' Ex. 22* at 206:20–25, 209:4–22.)  Felix testified that he "had TVs and [DVD] systems" installed in his SUV and his driver's side window did not work so could easily be pulled down." (*Id.* at 206:25–207:3, 207:10–25.)  Felix, therefore, decided to park the SUV "somewhere else where I know it will be safe because

---

[1] Defendants' Exhibits 1 through 13 are videos of the incident.

I didn't know who they were.  They can easily just break in my truck and steal all my stuff." (*Id.* 207:3–8.)

When Felix got back to his SUV, he looked inside the rear hatchback window, opened and closed the driver's side door, opened the hatchback and removed his bicycle, then opened and closed the driver's side door two more times. (*Defs' Ex. 1* at 2:16:35–8:18; *Defs' Ex. 2* at 2:17:49–2:21:10.)  At some point, he also retrieved a gun from inside the SUV and stuck it in his waistband. (*Defs' Ex. 22* at 213:1–24.)  Felix then sat on his bike, lit a cigarette, and rode out of the parking lot intending to find another place to park. (*Defs' Ex. 2* at 2:21:10–2:22:40; *Pl's Ex. A* at 206:20–207:8.)  As Felix was leaving the parking lot, one of the officers walked to the back of Felix's SUV, where he stood for about 10 seconds, then returned to the group hanging out behind Bainbridge's car. (*Id.* at 2:22:02–2:22:40.)

About six minutes after Felix left the parking lot, he returned on his bike and hung out by the driver's side door of his SUV. (*Defs' Ex. 3* at 2:27:40–2:31:50.)  After about four minutes, Officers Bigler and Duncan walked over and began talking to Felix. (*Id.* at 2:31:50–2:32:20.)  Officer Bigler testified that he wanted to establish communication with Felix to see if he could put him at ease because he believed Felix was staring at the group and "just generally looked angry." (*Defs' Ex. 15* at 32:8–22.)  Officer Duncan testified that he also hoped to ease any tension, "let [Felix] know that we were not a threat if for some reason he thought we were a threat.  And at the same time, just to let him know that we were there and if he were trying to do anything, we saw that he was there and there would be witnesses if anything." (*Defs' Ex. 17* at 21:25–22:9, 80:18–81:1.)  The two-minute conversation ended with a handshake and a "bro-hug" between Officer Bigler and Felix, after which Officer Bigler and Officer Duncan returned to join their friends. (*Defs' Ex. 3* at 2:32:00–2:34:19, *Defs' Ex. 4* 2:34:20–2:36:26.)  Officer Bigler said to the group, in effect, "I think "we're okay" or "we're good now." (*Defs' Ex. 15* at 40:18–22; *Defs' Ex. 16* at 27:11–16; *Defs' Ex. 17* 30:5–11; *Defs' Ex. 18* at 18:3–7.)

There is no evidence indicating that either officer told Felix they were off-duty police officers.

After talking to Officers Bigler and Duncan, Felix rode his bike out of the parking lot to look for parking at his apartment complex.[2] (*Defs' Ex. 4* 2:36:13– 2:37:03; *Pl's Ex. G* [Doc. 50-7] 7:1–6.)  Felix found a parking spot and rode back to his SUV about seven minutes later. (*Defs' Ex. 4* at 2:37:00–2:42:36, *Defs' Ex. 5* at 2:42:37– 2:44:22; *Pl's Ex. G* at 7:7–12.)  He acknowledged that when he returned to the McGregor's parking lot, he was "a little bit paranoid because" because he had observed the officers go to his SUV twice and felt that "if they see me come back, I know they were going to start shit or whatever." (*Defs' Ex. 22* at 235:13–17.)  As Felix reached his SUV, Officer Bigler walked over to Felix again hoping to resolve any issues. (*Defs' Ex. 5* at 2:44:40–2:45:00; *Defs' Ex. 15* at 45:1–10.)  After talking to Felix for approximately five minutes, Officer Bigler returned to the group and Felix loaded his bicycle into the SUV and drove away. (*Defs' Ex. 5* at 2:45:00–2:50:52, *Defs' Ex. 6* at 2:50:54–2:51:00.)

By the time Felix drove to his apartment complex, the parking spot was taken. (*Pl's Ex. G* at 7:13–19.)  Therefore, approximately ninety seconds later, Felix drove back into the McGregor's parking lot and parked his SUV one spot closer to Officer Bainbridge's car. (*Defs' Ex. 6* at 2:52:30–2:52:45.)  Felix then exited his SUV, opened his hatchback, removed his bicycle, closed the hatchback and walked with his bicycle to the driver's side door. (*Id.* at 2:52:45–2:53:53.)  While Felix was standing by the driver's door, Officer Bigler again walked over to Felix. (*Id.* 2:53:55–2:54:05.)  Officer Bigler recalls telling Felix, in effect, "hey, I thought you were taking off for the night." (*Pls' Ex. D* [Doc. 50-4] 48:13–15.)  He did not recall Felix's response. (*Id.* at 48:15–22.)  Officer Bigler then walked back to the other officers. (*Defs' Ex. 6* at 2:54:05–2:54:50.)

---

[2] At about this time, Officer Rodriguez left because he had to work the following day. (*Defs' Ex. 4* at 2:36:45–2:37:24; *Defs' Ex. 21* [Doc. 49-11] 37:23–38:6.)

After Officer Bigler walked away, Felix remained by the driver's door, lit a cigarette, "said something toward [the] group" and appeared to gesture toward the officers a few times. (*Defs' Ex. 6* at 2:54:50–2:55:28; *Pl's Ex. B* [Doc. 50-2] 38:19–21.) Officer Duncan could not hear what Felix said, so decided to walk over to talk to Felix. (*Id.* at 2:55:28–2:55:40.) As he reached Felix, Officer Duncan said, in effect, "I didn't hear what you said." (*Id.* at 40:15–22.) He testified that Felix responded that "you guys want to kick my ass." (*Defs' Ex. 17* 40:25–41:1.) Officer Duncan replied that "no, nobody want[s] to do that. No, we're not here for that." (*Id.* 41:5–7.)

Meanwhile, immediately after Officer Duncan began talking to Felix, Officer Bigler again walked toward Felix, followed by Officer Dabbaghian. (*Defs' Ex. 10.* at 2:55:40–2:55:47.) Upon seeing the other men approach, Felix felt threatened and believed he was "going to get jumped." (*Pl's Ex. A* at 256:25–257:3.) Felix also believed he heard someone use "cuss words" as they approached. (*Id.* at 257:7–16.) Felix then grabbed the gun from his waistband and claims he "immediately" pointed it at the ground. (*Id.* at 257:17–22, 258:2–9, 261:15–17.) Felix contends he grabbed the gun to scare the men, so they "can see I'm armed, not to come at me no more, to leave me alone. It was just for me to show them that I'm armed. Don't come any closer." (*Id.* 257:25–258:1, 260:6–13.)

When Felix grabbed his gun, Officers Bigler, Duncan and Dabbaghian immediately drew their weapons and pointed them at Felix. (*Defs' Ex. 10* at 2:55:48–2:55:50.) Officers Dabbaghian and Duncan yelled "gun, gun, gun" and began yelling at Felix to drop his gun. (*Defs' Ex. 16* at 44:22–45:7, 53:24–54:2; *Defs' Ex. 17* at 43:21–25, 45:16–19; *Defs' Ex. 15* at 54:6–8.) Felix immediately began to roll backward on his bicycle toward the back of the SUV, as Officers Bigler and Dabbaghian followed him with their guns drawn. (*Defs' Ex. 10* at 2:55:50–2:55:52.) Officer Bainbridge then approached with his weapon drawn, followed by Officer Duncan. (*Id.* at 2:55:55–2:56:02.) Felix continued to back up passed the back of his SUV, then began rolling slowly forward toward the exit of the parking lot, still holding the gun in his right hand.

6

(*Id.* 2:55:53–2:56:04.)  Felix then stopped as the officers gathered a few feet away with their weapons pointed at him.  (*Id.* at 2:56:02–2:56:04.)

Soon after Felix stopped, Officer Bainbridge kicked Felix in the abdomen or chest area, attempting to knock him off his bike but was unsuccessful.  (*Defs' Ex. 6* at 2:56:04–2:56:07.)  The other officers then quickly swarmed Felix, as he tried to role away on his bike.  (*Id.* at 2:56:07–2:56:11.)  Eventually, the officers tackled Felix, who landed on his bike and on his hands and knees, while continuing to hold the gun in his right hand. (*Id.*)  The officers continued to struggle with Felix and eventually forced Felix onto his stomach. (*Defs' Exs. 6, 10* at 2:56:11–2:56:38.)  Officers Duncan and Dabbaghian punched Felix numerous times intending to distract him and gain control.  (*Id.*; *Defs' Ex. 19* [Doc. 49-9] ¶ 5.)  At some point while Felix held the gun, Officer Bainbridge applied a modified carotid restraint and Felix lost consciousness for a few seconds. (*Defs' Ex.* 18 at 38:13–16, 40:6–412.)  Officer Bigler was then able to grab Felix's gun, toss it to the side and tell the others, in effect, "I got the gun" and "it's a real gun." (*Defs' Ex. 10* at 2:57:14–2:57:28; *Defs' Ex. 20* [Doc. 49-10] ¶ 5.) While Officers Duncan and Dabbaghian kept control of Felix, Officer Bainbridge retrieved handcuffs from his car. (*Defs' Ex. 10* at 2:57:17–2:57:40; *Defs' Ex. 18* at 43:21–24.)  Felix was handcuffed and Officer Bainbridge called the watch commander and the men waited with Felix for uniformed officers to arrive. (*Defs' Ex. 6* at 2:57:40 –2:59:11; *Defs' Ex. 7* at 2:57:12–3:03:26; *Defs' Ex. 18* at 48:16–21.)

When uniformed officers arrived, they took custody of Felix's gun. (*Defs' Ex. 23* at COSD_0005.)  As a result of the arrest, Felix suffered a fractured vertebra, broken hand and a laceration to the back of his head requiring three staples to close.  (*Pls' Ex. A* at 276:3–8, 281:17–20, 283:3–21, 284:16–25.)  He was eventually charged with several crimes, including assault with a deadly weapon (firearm), brandishing a firearm in a threatening manner, felon in possession of a firearm and possession of a controlled substance. (*Defs' Ex. 23* at COSD_0001; *Defs' Ex. 27* [Doc. 49-17] ¶3.)  Felix entered a

7

plea agreement, in which he agreed to plead guilty to the latter two charges. (*Defs' Ex. 22* at 299:17–300:24; *Defs' Ex. 24* [Doc. 49-14] COSD_0333.)

On May 10, 2019, Felix filed this lawsuit against the City and the four off-duty officers involved in his arrest.  The Complaint asserts four causes of action for: (1) Excessive Force under 42 U.S.C. § 1983; (2) Excessive Force in violation of the Bane Act, Cal. Civil Code § 52.1; (3) Assault and Battery; and (4) Negligence.  Defendants now move for summary judgment as to each of the causes of action and Felix's request for punitive damages.

## II.   LEGAL STANDARD

Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A fact is material when, under the governing substantive law, it could affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Freeman v. Arpaio, 125 F.3d 732, 735 (9th Cir. 1997).  A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323.  The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial.  Id. at 322-23.  "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment."  T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

"The district court may limit its review to the documents submitted for the purpose of summary judgment and those parts of the record specifically referenced therein." Carmen v. San Francisco Unified School Dist., 237 F.3d 1026, 1030 (9th Cir. 2001). Therefore, the court is not obligated "to scour the record in search of a genuine issue of triable fact." Keenan v. Allen, 91 F.3d 1275, 1279 (9th Cir. 1996) (citing Richards v. Combined Ins. Co., 55 F.3d 247, 251 (7th Cir. 1995)).

If the moving party meets its initial burden, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Triton Energy Corp. v. Square D Co., 68 F.3d 1216, 1221 (9th Cir. 1995) (citing Anderson, 477 U.S. at 252) ("The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient."). Rather, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (quoting Fed.R.Civ.P. 56(e)).

When making this determination, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. See Matsushita, 475 U.S. at 587. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." Anderson, 477 U.S. at 255.

## III.   DISCUSSION

The Officer Defendants contend they are entitled to qualified immunity with respect to Felix's cause of action for Excessive Force under 42 U.S.C. § 1983. (*P&A* [Doc. 49-1] 11:22–21:15.) They also argue that because the force used against Felix was reasonable, summary adjudication is appropriate against Felix's assault and battery, negligence and punitive damages claims. (*Id.* 22:6–25:16.) Finally, Defendants contend Felix's Bane Act claim lacks merit because there is no evidence the officers specifically

9

intended to violate Felix's constitutional rights. (*Id.* 21:16–22:5.) Felix argues disputed issues of material fact exist that preclude summary adjudication for each of his claims. (*Opp'n* [Doc. 50] 22:1–5, 23:17–18, 24–26, 24:7–9, 20–21.)

### A.   <u>Qualified Immunity</u>

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009) (citing <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." <u>Id.</u> A public official is entitled to qualified immunity "unless the official's conduct violated a clearly established constitutional right. [Citation omitted.]" <u>Id.</u> at 232.

In <u>Saucier v. Katz</u>, 533 U.S. 194 (2001), the Supreme Court mandated a two-step approach to evaluating qualified immunity. First, the court must decide if the facts make out a violation of a constitutional right. <u>Id.</u> at 201. If so, the second step is whether the right at issue was "clearly established" at the time of the official's alleged misconduct. <u>Id.</u>[3] Whether the governing law was clearly established and whether specific facts constitute a violation of established law are legal determinations. <u>Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.</u>, 237 F.3d 1101, 1106 (9th Cir. 2001).

Here, Defendants argue their use of force was reasonable given Felix's possession of a gun. Alternatively, even if their use of force was not reasonable, the officers argue the law was not clearly established at the time.

---

[3] In <u>Pearson v. Callahan</u>, 555 U.S. 223, 236 (2009), the Supreme Court held that while the mandatory two-step sequence set forth in <u>Saucier</u> "is often appropriate, it should no longer be regarded as mandatory."

1   Felix responds that disputed issues of material fact preclude a finding that the

2   officers' use of force was reasonable.  Alternatively, Felix argues that even if the initial

3   use of force was reasonable, Officer Bigler's continued use of force after Felix was

4   subdued constituted a violation of Felix's Fourth Amendment rights.

5

6   **1.    Was there a violation of a constitutional right or was the officers' use of**

7   **force objectively reasonable?**

8   In evaluating excessive-force claims, "courts ask 'whether the officers' actions are

9   'objectively reasonable' in light of the facts and circumstances confronting them." Glenn

10  v. Washington County, 673 F.3d 864, 871 (9th Cir. 2011).  This involves a balancing of

11  "the nature and quality of the intrusion on the individual's Fourth Amendment interests

12  against the countervailing governmental interests at stake." Graham v. Connor, 490 U.S.

13  386, 396 (1989).  On summary judgment, the facts and circumstances are generally based

14  on the plaintiff's version of facts. Scott, 550 U.S. at 378.

15  In Graham, 490 U.S. 386 (1989), the Supreme Court explained the balancing test

16  requires an examination of the "facts and circumstances of each particular case, including

17  the severity of the crime at issue, whether the suspect poses an immediate threat to the

18  safety of the officers or others, and whether he is actively resisting arrest or attempting to

19  evade arrest by flight." Id at 396.  Because the determination is based on the totality of

20  the circumstances, courts may also consider other factors relevant to the particular case.

21  Mattos v. Agarano, 661 F.3d 433, 441, 451 (9th Cir. 2011); Davis v. City of Las Vegas,

22  478 F.3d 1048, 1054-57 (9th Cir. 2007) (recognizing that courts also examine the

23  availability of alternatives to the amount of force used, and the mental and emotional

24  state of the plaintiff).  "Ultimately, 'the most important' *Graham* factor is whether the

25  individual posed an 'immediate threat to the safety of the officers or others." Mattos, 661

26  F.3d at 441 (citation omitted).

27  Although courts view evidence in the light most favorable to the non-moving party

28  in summary judgment, "[t]he 'reasonableness' of a particular use of force must be judged

1  from the perspective of a reasonable officer on the scene, rather than with the 20/20

2  vision of hindsight." <u>Graham</u>, 490 U.S. at 396.  "Excessive force claims … are evaluated

3  for objective reasonableness based upon the information the officers had when the

4  conduct occurred." <u>County of Los Angeles, Calif., v. Mendez</u>, – U.S. –, 137 S.Ct. 1539,

5  1546–47 (2017) (quoting <u>Saucier</u>, 533 U.S. at 207).  "The calculus of reasonableness

6  must embody allowance for the fact that police officers are often forced to make split-

7  second judgments—in circumstances that are tense, uncertain, and rapidly evolving—

8  about the amount of force that is necessary in a particular situation." <u>Glenn</u>, 673 F.3d at

9  871 (quoting <u>Graham</u>, 490 U.S. at 397).

10      Here, Felix argues each of the officers used excessive force when they tackled him

11  after he pulled a gun.  Felix also contends Officer Bigler used excessive force when he

12  punched Felix after he was disarmed.

13

14      ***a.   The nature of the intrusion on Felix's Fourth Amendment rights.***

15      Defendants argue that based on the force used against Felix—i.e., "a kick to

16  Plaintiff's abdomen or chest, physical force, distraction punches and a carotid

17  restraint"—the "nature and quality of the subject intrusion is intermediate levels of

18  force." (*P&A* 15:14–16, 16:13–14.)  Felix does not address this issue.

19      Evaluating the nature of the intrusion on an individual's rights requires an

20  assessment of "the type and amount of force inflicted." <u>Deorle v. Rutherford</u>, 272 F.3d

21  1272, 1279 (9th Cir. 2001).  "Even where some force is justified, the amount actually

22  used may be excessive." <u>Glenn</u>, 673 F.3d at 871.  Where the plaintiff suffers a serious

23  injury that is endured for a significant period of time, the nature of the intrusion is severe.

24  <u>See</u> <u>Santos v. Gates</u>, 287 F.3d 846, 853–54 (9th Cir. 2002) (finding nature of intrusion

25  severe where plaintiff suffered broken back after allegedly being shoved to the ground by

26  officers); <u>Palmer v. Sanderson</u>, 9 F.3d 1433, 1436 (9th Cir. 1993) (officer's application of

27  handcuffs tight enough to cause pain and discoloration of wrists for several weeks

28  supported excessive force claim); <u>but see</u> <u>Jackson v. City of Bremerton</u>, 268 F.3d 646

(9th Cir. 2001) (intrusion minimal where plaintiff suffered broken finger and discomfort when pepper spray on her hair ran into her eye).

Here, the San Diego Police Department's Procedure confirms the nature and type of force used against Felix was an intermediate level of force.  (*Defs' Ex. 26* [Doc. 49-16] COSD_0404, 0410.)  There is also evidence that the force used resulted in significant injuries to Felix, including a fractured vertebra, broken hand and a laceration to the back of his head requiring three staples to close.  (*Pls' Ex. A* at 276:3–8, 281:17–20, 283:3–21, 284:16–25.)  Under the circumstances, the evidence supports an inference that the intrusion on Felix's Fourth Amendment rights was significant.

### b.    *Government's interest in the use of force.*

In evaluating the government's interest in the use of force, courts consider the three factors identified in <u>Graham</u>: (1) the nature of the crime; (2) whether plaintiff posed a threat; and (3) whether plaintiff was attempting to flee or resist arrest.  <u>Id.</u>, 490 U.S. at 396.  Additionally, because excessive force claims are evaluated under the totality of the circumstances, courts also "consider 'whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*.'"  <u>See</u> <u>Mattos</u>, 661 F.3d at 441 (quoting <u>Bryan v. MacPherson</u>, 630 F.3d 805, 826 (9th Cir. 2010)).   In evaluating each factor, disputes must be resolved in Felix's favor.  <u>Scott</u>, 550 U.S. at 378 ("courts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the motion'").

### (i)    <u>*Nature of the crime*</u>

Defendants argue the crime at issue was assault with a deadly weapon, which "has been deemed a 'crime of violence' and is therefore serious."  (*P&A* 17:9–11.)  Felix does not specifically address this factor.

Among the crimes at issue were assault with a deadly weapon and exhibiting a firearm in a threatening manner. (*Defs' Ex. 23* [Doc. 49-13] at COSD_0001; *Defs' Ex. 27*

13

[Doc. 49-17] ¶ 3.)  The Court agrees with Defendants that the nature of the crime was serious.  See United States v. Grajeda, 581 F.3d 1186, 1189–92 (9th Cir. 2009) (finding assault with a deadly weapon or force likely to cause great bodily injury constitutes as a crime of violence and thus qualifies for the sixteen-level sentencing enhancement under Federal law).  This factor weighs against a finding of excessive force.

### (ii)    Threat to officers

Defendants argue Felix posed a significant risk to the officers.  In support of this argument, Defendants contend Felix "raised his right arm and pointed his gun directly at Duncan." (*P&A* at 17:13–14.)  As Felix "was lowering his gun, it was [then] momentarily pointed in Dabbaghian's direction . . ." and even when the gun was pointed at the ground, in a "split second" Felix could have pointed the gun upwards just by moving his wrist.  (*Id.* at 17:16–18:2.)  Additionally, as the officers were struggling with Felix on the ground, Felix held the gun with the barrel pointed in Officer Bigler's direction.  (*Id.* at 18:5–8.)  In support of this argument, Defendants cite the officer's deposition testimony.  However, in opposition, Felix denies pointing the weapon at of the officers, and instead contends it was pointed toward the ground.  (*Felix Decl.* ¶ 7; *Pl's Ex. A* at 158:10–16, 261:15–21.)

Aside from the parties' conflicting testimony, Defendants also cite video footage of the incident to support their contention that Felix pointed his gun at them.  However, the videos are extremely grainy, and it is difficult to tell where Felix's gun was pointed.  The poor video quality is exacerbated by Felix's location when he first pulled the gun from his waistband—i.e., in between two vehicles.  Because the video does not resolve the dispute, the Court finds a disputed issue of fact exists regarding whether Felix pointed the gun at any of the officers.

Nevertheless, regardless of whether Felix pointed the gun directly at the officers, there is no dispute he pulled a gun from his waistband and even if the gun was pointed at the ground, Felix could have easily raised the gun and fired at the officers within seconds.

14

It is also beyond dispute that guns pose a serious risk to public safety, capable of inflicting grave injuries from significant distances.  Based on these undisputed facts, the Court finds the officers reasonably believed Felix posed a significant threat to their safety.  This factor weighs against a finding of excessive force.

### (iii)   *Resisting arrest or attempting to flee.*

Defendants argue Felix resisted and attempted to evade arrest.  In support of this argument, Defendants contend that when they ordered Felix to drop his gun, he "refused and started to back up and then move forward on his bicycle." (*P&A* 18:16–19.)  In response, Felix contends that none of the Defendants identified themselves as officers and that he did not learn they were officers until he was in the hospital.  (*Felix Decl.* ¶¶ 8, 9.)

In addition to Felix's declaration, his contention that the officers did not identify themselves is supported by other evidence.  For example, during their depositions, the officers each denied or could not recall identifying themselves as officers before using force to tackle Felix.  (*See Defs' Ex. 15* at 41:10–14; *Defs' Ex. 16* at 54:3–4; *Defs' Ex. 17* at 58:12–16; *Defs' Ex. 18* at 46:4–21.[4])  Accordingly, a disputed issue of fact exists regarding whether Felix knew or should have known Defendants were officers.

Whether the officers identified themselves is an important fact for several reasons.  For purposes of the third <u>Graham</u> factor, the officers' alleged failure to identify themselves, coupled with the fact that they were not in uniform, supports Felix's contention that he did not know the men were officers and thus did not know he was refusing to comply with an officer's order to drop the weapon.  See <u>Vlasak v. Las Vegas Metropolitan Department</u>, 213 Fed. Appx. 512 (9th Cir. 2006) (plainclothes officers

---

[4] The Court recognizes that Officer Bigler testified that he heard someone say, "police drop the gun." (*Defs' Ex. 15* at 42:20–23.)  As reflected by the cited testimony, none of the other officers could recall identifying themselves as such and Felix testified that they did not identify themselves as officers.

failure to identify themselves as law enforcement created situation in which plaintiff understandably resisted their efforts to subdue him).  Accordingly, a reasonable jury could find Felix was not resisting arrest or attempting to flee officers.  This fact weighs in favor of a finding of excessive force.

> ### (iv)   The officers' role in creating situation in which the use of force was necessary & reasonableness of Felix's conduct.

The officers' failure to identify themselves is significant for other reasons.  In evaluating excessive-force claims, courts consider the extent to which an officer's bad decisions contributed to the circumstances requiring the use of force.  For example, in S.R. Nehad v. Browder, 929 F.3d 1125 (9th Cir. 2019), the Ninth Circuit explained that the latitude Graham requires for split-second judgments does not apply where the officer creates the sense of urgency:

> We recognize, as we have often done before, that officers must act "without the benefit of 20/20 hindsight," and must often make "split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  Gonzalez v. City of Anaheim, 747 F.3d 789, 794 (9th Cir. 2014) (quoting Graham, 490 U.S. at 396–97, 109 S.Ct. 1865); see also Deorle v. Rutherford, 272 F.3d 1272, 1283 (9th Cir. 2001).  Sometimes, however, officers themselves may "unnecessarily create their own sense of urgency." Torres v. City of Madera, 648 F.3d 1119, 1127 (9th Cir. 2011); see also Porter v. Osborn, 546 F.3d 1131, 1141 (9th Cir. 2008) ("When an officer creates the very emergency he then resorts to deadly force to resolve, he is not simply responding to a preexisting situation.").  Reasonable triers of fact can, taking the totality of the circumstances into account, conclude that an officer's poor judgment or lack of preparedness caused him or her to act unreasonably, "with undue haste." Torres, 648 F.3d at 1126.

Id. at 1135 (footnote and internal brackets excluded).

Here, there is evidence that would support a jury's finding that the officers exercised bad judgment in confronting Felix.  San Diego Police Department Policy Manual provides, in relevant part, the following with respect to off-duty officers:

16

*Prior to taking law enforcement action when off duty, officers who observe or who are told of criminal activity shall first consider contacting the appropriate law enforcement agency and have on duty officers respond.*

In determining whether or not to intervene, the off duty officer should consider the totality of the situation. In a case where action is necessary to prevent death, the possibility of death or serious bodily injury, significant property damage or loss, the off duty officer should consider the offense involved, the difficulty that being off duty tactically and operationally presents, and/or other factors as articulated and observed by the officers.

\* \* \*

*If an off duty officer intervenes in the criminal conduct, he/she must, if reasonably possible, identify themselves, their agency* and their intent to stop the criminal conduct. Any law enforcement action taken will be governed by Department policies and procedures that apply to on duty personnel. (Exhibit U: San Diego Police Policies and Procedures).

(*Pl's Ex. Q* [Doc. 50-17] § 9.01, emphasis added.)

There is no dispute that even before the officers first approached Felix, some believed he was about to engage in criminal conduct. For example, during their depositions, Officers Duncan and Dabbaghian testified they believed Felix was casing them or vehicles in the parking lot to rob. (*Defs' Ex. 16* at 20:17–21:22; *Defs' Ex. 17* at 16:17–20.) Officer Duncan also testified that one of the reasons he first approached Felix was to let him know there were witnesses in case he was planning criminal activity. (*Defs' Ex. 17* at 21:25–22:15.) Additionally, when Felix returned to the parking in his SUV, it created "a heightened sense of security" with Officer Duncan, who retrieved his gun from his truck. (*Defs' Ex. 17* at 31:9–32:25.) Moreover, there is also no dispute that the officers' decisions were made shortly after drinking alcohol. (*Pl's Ex. B* at 25:6–8; *Pl's Ex. C* at 12:13–17; *Pl's Ex. D* at 27:23–15; *Pl's Ex. E* at 20:24–21:7.) Construing the facts in favor of Felix, a reasonable jury could find Defendants exercised bad judgment by not contacting uniformed officers and not identifying themselves as officers, which led to the need to use force.

17

Finally, in <u>Blankenhorn</u>, the Ninth Circuit indicated that "a person has a 'limited right to offer reasonable resistance to an arrest that is the product of an officer's personal frolic. That right is not triggered by the absence of probable cause, but rather by the officer's bad faith or provocative conduct." <u>Blankenhorn v. City of Orange</u>, 485 F.3d 463, 479 (9th Cir. 2007) (quoting <u>United States v. Span</u>, 970 F.2d 573, 580 (9th Cir. 1992)). Here, Felix contends he pulled his weapon because he feared for his safety when he saw the three officers approaching him and heard someone cussing. (*Pl's Ex. A* at 256:25–258:1, 260:6–13.) Assuming Defendants did not identify themselves as officers (and that Felix did not otherwise know they were officers[5]), a jury could find Felix's brandishing of his firearm was reasonable under the circumstances.

### *(v)   Balance of factors*

Whether the officers used excessive force in this case is a close call. Two important <u>Graham</u> factors support a finding that the officers' use of force was reasonable. However, if a jury finds that Felix did not know Defendants were officers, a jury could also find Felix was not resisting arrest at the time of the incident; Defendants used poor judgment, which directly resulted in the need to use force; and Felix's brandishing of the firearm was reasonable. Under these circumstances, and reading all inferences in favor of Felix, the Court finds a rational jury could find Defendants' use of force was excessive.

### 2.    Was the law clearly established?

The "clearly established" prong is a matter of law to be decided by a judge. <u>Reese v. County of Sacramento</u>, 888 F.3d 1080, 1037 (9th Cir. 2018). In evaluating whether a

---

[5] Officer Bainbridge testified that his off-duty badge was clipped on his belt. (*Defs' Ex. 18* at 46:13–18.) To the extent Felix saw his badge while in the bar, for example, there could be evidence indicating Felix knew Bainbridge was an officer.

right is "clearly established," the "relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202. In determining whether a right is clearly established, courts "may look at unpublished decisions and the law of other circuits, in addition to Ninth Circuit precedent." Prison Legal News v. Lehman, 397 F.3d 692, 702 (9th Cir. 2005); Sorrels v. McKee, 290 F.3d 965, 970 (9th Cir. 2002) (looking to "decisions of our sister Circuits, district courts, and state courts" in evaluating if law was clearly established).

"[A] defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." Plumhoff v. Rickard, 134 S.Ct. 2012, 2023 (2014). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of preexisting law the unlawfulness must be apparent." Anderson v. Creighton, 483 U.S. 635, 640 (1987). This is particularly true in the Fourth Amendment context, "where the Supreme Court has recognized that 'it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." Reese, 888 F.3d at 1038 (brackets omitted) (quoting Mullenix v. Luna, 577 U.S. 7, 11 (2015)).

Defendants argue that even if their use of force was not objectively reasonable, the law was not clearly established. In response, Felix contends Vlasak, 213 Fed.Appx. 512, and Blankenhorn, 485 F.3d 463, establish the officers' use of force was excessive. Alternatively, Felix argues the cases establish Officer Bigler's punches after Felix was disarmed were excessive.

### a. Use of force to disarm Felix.

In Vlasak, 213 Fed.Appx. 512, plainclothes police officers inside a Las Vegas hotel wrestled plaintiff to the ground and arrested him for obstruction and battery on a police officer. At the time of the arrest, the officers' badges were covered and they

19

allegedly failed to identify themselves as officers.  Plaintiff sued the officers for arresting him without probable cause and excessive force in violation of his Fourth Amendment rights.  The district court found the officers were entitled to qualified immunity and granted their summary-judgment motion.

The Ninth Circuit reversed the district court because disputed issues of material fact existed regarding "whether and when [the officers] identified themselves to Dr. Vlasak as police officers."  Id.  Regarding the excessive-force claim, the court explained,

> Whether Officers Brandon and Fox used excessive force depends on whether they had identified themselves to Dr. Vlasak as police officers. If they had so identified themselves, they properly used reasonable force to subdue a person who had refused to obey a lawful order given by persons known to be police officers. On the other hand, if they had not so identified themselves, they unnecessarily created a situation in which Dr. Vlasak understandably resisted their efforts to subdue him, and in which their use of force was unnecessary and therefore excessive.

Id. (citing Graham, 490 U.S. at 397; Alexander v. City of S.F., 29 F.3d 1355, 1367 (9th Cir. 1994)).

Felix argues Vlasak clearly establishes the officers violated his 4th Amendment rights because the case "addressed the exact same issue we have in this case; the allegation that police officers did not identify themselves as such in a 1983 excessive force case."  (Opp'n [Doc. 50] 14:28–15:3.)  Although somewhat persuasive, ultimately there are material distinctions between this case and Vlasak that this Court finds could not have made it apparent to the officers that they were violating Felix's 4th Amendment rights.  First, and perhaps most important, there is no indication the plaintiff in Vlasak posed any threat to the officers.  In contrast, Felix was holding a gun and, therefore, posed a significant danger to the officers.  Second, the nature of the crime at issue in Vlasak was far less serious than Felix's assault with a deadly weapon and brandishing a firearm.

Next, Felix argues Blankenhorn should have notified the officers that their conduct violated his Fourth Amendment rights.  Felix's reliance on Blankenhorn is misplaced for

20

the same reason as his reliance on <u>Vlasak</u>: the plaintiff in <u>Blankenhorn</u> did not possess a weapon, did not pose a significant danger to the officers and the nature of the offense—a misdemeanor trespass—was considered of minimal severity.  <u>Id.</u> at 478.

For these reasons, the Court finds Felix has failed to demonstrate that the law was clearly established with respect to the officers' use of force to disarm him.

### b.      Use of force after Felix was disarmed.

Although <u>Blankenhorn</u> did not clearly notify the officers that their use of force in disarming Felix may have been objectively unreasonable, the case established that Officer Bigler's punches after Felix was disarmed constituted excessive force.

In <u>Blankenhorn</u>, Officer Nguyen found plaintiff Blankenhorn, a known gang member, at a shopping mall from which he had previously been evicted and banned.  <u>Id.</u> 485 F.3d at 467, 468.  When the officer attempted to talk to Blankenhorn, he began to walk away from the officer, who moved in front of Blankenhorn and grabbed his arm. Blankenhorn yanked his arm away, and Officer Nguyen threatened to spray him with mace.  As other officers arrived, Blankenhorn admitted he was "'angry' and 'loud,' that he used profanity and, in frustration, he threw his driver's license on the ground." <u>Id.</u> 469.  Officer Nguyen then ordered Blankenhorn to kneel down so he could handcuff him. Blankenhorn refused, saying "I'm not going to my f***ing knees" and immediately three officers jumped on him.  <u>Id.</u>   After struggling for several seconds, the officers tackled Blankenhorn, handcuffed him and secured his wrists and ankles with rip-hobble restraints.  <u>Id.</u>  During the struggle, Nguyen punched Blankenhorn several times in an attempt to distract him from resisting by pinning his arms under his body, while another officer placed a knee behind his neck and pressed his face to the ground.  <u>Id.</u> 469-70, 480.

In Blankenhorn's civil-rights lawsuit, the officers filed a summary-judgment motion seeking, among other things, qualified immunity on the excessive-force claim.  In evaluating whether Officer Nguyen's distraction punches constituted excessive force, the Ninth Circuit emphasized that "[u]nderlying *Graham*'s objective-reasonableness test is

21

the clear principle that the force used to make an arrest 'must be balanced against the need for force: it is the *need* for force which is at the heart of the *Graham* fctors.'"   Id. at 480 (quoting Liston v. County of Riverside, 120 F.3d 965, 976 (9th Cir. 1997).  Because Blankenhorn denied resisting by pinning his arms under his body and the court was required to credit his "version of the events" at the summary-judgment stage, the Ninth Circuit concluded,

> a rational jury could find that if Blankenhorn did not maneuver his arms beneath his body it eliminated the need for any use of force to release them, and thus that Nguyen's punches were not reasonably justified by the circumstances as he claims.

Id.

If a rational jury could find Officer Nguyen's punches were not reasonably justified, then a rational jury could find Officer Bigler's punches were also not reasonably justified.  Under Felix's version of events, there was no need to continue to use force, especially after he was disarmed.  Accordingly, the Court finds the law was clearly established that Officer Bigler's punches—under Felix's version of events—violated Felix's Fourth Amendment rights.

### B.   Assault, battery & negligence causes of action

Defendants argue summary judgment is warranted against Felix's assault, battery, and negligence causes of action because, in essence, they did not use excessive force. Because the Court has found disputed issues of material fact preclude a finding that they did not use excessive force, Defendants' argument regarding the assault, battery and negligence causes of action fail.

### C.   Bane Act cause of action

Defendants also seek summary adjudication of Felix's Bane Act cause of action, arguing that there is "no evidence that the Individual Defendants or the City had any specific intent to violate Plaintiff's constitutional right."  (*P&A* 22:2–4.)  Felix argues

22

Defendants' motion should be denied because there is evidence Defendants acted in reckless disregard of his constitutional rights.  (*Opp'n* 23:7–16.)

In Reese v. County of Sacramento, 888 F.3d 1030 (9th Cir. 2018), officers responded to an anonymous 911 call at 5:00 a.m. alleging "an African-American male had exited apartment 144 and fired an automatic gun.  The caller also stated that the male was possibly crazy, under the influence of drugs, had a knife, and was back inside apartment 144."  Id. at 1035.  When officers arrived, they decided that Deputy Brown, who had a rifle, would stand back about 15 feet to cover the doorway while Deputy Rose would stand to the side and knock on the door with other deputies lined up behind him. Deputy Rose then knocked on the door with his flashlight, while holding his firearm in the other hand.  "[T]he door flew open" and a "figure" came out with his "arm up, extended" holding a large knife.  Id. at 1035.  After seeing the knife, Deputy Brown fired his rifle.  Meanwhile, Deputy Rose had backed away from the door, then immediately rushed into the apartment after Deputy Brown fired his rifle expecting to see the man shot and incapacitated.  Instead, Deputy Rose saw him standing up right in the apartment and, without seeing if the man still had the knife, immediately fired one shot at his chest.  The man survived and filed a lawsuit alleging a Fourth Amendment excessive-force claim and Bane Act claim.

At trial, the jury determined that when Deputy Rose shot the plaintiff, he was no longer holding a knife and therefore returned a verdict in favor of the plaintiff on the Fourth Amendment excessive force and Bane Act claims.  The district court then granted Deputy Rose's post-trial motion finding he was entitled to qualified immunity on the Fourth Amendment claim and granted defendants "summary judgment *sua sponte*" on the Bane Act claim.  Id. at 1036.

On appeal, the Ninth Circuit found that although the evidence supported the jury's finding that Officer Rose used excessive force, the law was not clearly established and thus affirmed the district court's ruling granting regarding qualified immunity on the Fourth Amendment claim.  With respect to the Bane Act claim, the Ninth Circuit clarified

23

that a plaintiff does not automatically prevail on a Bane Act claim by establishing a Fourth Amendment excessive-force violation.  Id. at 1044.  The reason is that the inquiry in a Fourth Amendment excessive-force case focuses on "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  Id. at 1045 (citing Graham, 490 U.S. at 397).  According to the court,

> a mere intention to use force that the jury ultimately finds unreasonable— that is, general criminal intent—is insufficient." *United States v. Reese*, 2 F.3d 870, 885 (9th Cir. 1993).  Rather, the jury must find that the defendants "intended not only the force, but its unreasonableness, its character as "more than necessary under the circumstances.'" *Id.*  But it is not necessary for the defendants to have been "thinking in constitutional or legal terms at the time of the incident, because a reckless disregard for a person's constitutional rights is evidence of specific intent to deprive that person of those rights." *Id.*

Id. at 1045.  Applying this standard, the court found that "[a]lthough there was no evidence of coercion *independent* from Deputy Rose's use of objectively unreasonable force, we cannot conclude from the record that, taking the evidence in the light most favorable to Reese, no reasonable jury could find that Deputy Rose had a specific intent to violate Reese's Fourth Amendment rights."  Id. at 1045.

Reese is important for two reasons.  First, the case supports Felix's contention that a reckless disregard for his Fourth Amendment rights is sufficient to support a Bane Act violation.  Second, despite holding that a finding of excessive force does not automatically establish a Bane Act violation, the decision—i.e., finding that Deputy Rose's millisecond failure to identify that Reese had dropped the knife may support a Bane Act violation—strongly suggests that courts should exercise caution in dismissing a Bane Act claim where there is evidence suggesting the force used was unreasonable.

As discussed above, here, there is evidence that after drinking alcohol at McGregor's, the officers suspected Felix was planning to engage in criminal activity and decided to engage Felix.  Eventually, the officers became sufficiently concerned with

24

Felix's conduct that they decided to grab their firearms, yet still did not call for uniformed officers and never notified Felix that they were off-duty officers.  There is also no dispute that after Felix returned in his SUV, three of the off-duty officers again approached Felix, who claims he heard someone cussing as they approached. Additionally, a disputed issue of fact exists regarding whether Felix was resisting when Bigler punched him in the head.  Reading these facts in favor of Felix, and given the Ninth Circuit's decision in <u>Reese</u>, the Court finds a rational jury could find the officers acted in reckless disregard for Felix's Fourth Amendment rights and thus violated the Bane Act.

### D.   **Punitive Damages.**

Defendants also seek summary adjudication of Felix's punitive damages claim. For the reasons discussed above with respect to the Bane Act claim, summary judgment is not warranted.

## IV.   CONCLUSION & ORDER

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' summary-judgment motion [Doc. 49].

**IT IS SO ORDERED**

Dated:  September 30, 2021

_____
Hon. Thomas J. Whelan
United States District Judge

25